## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

CASE NO.:

MARCIA MCMANUS,

     Plaintiff,

v.

AMERIJET INTERNATIONAL, INC.,

     Defendant.

_____ /

## **COMPLAINT**

Plaintiff, MARCIA MCMANUS, hereby sues Defendant, AMERIJET INTERNATIONAL, INC., a Florida corporation, and avers:

## **PARTIES, JURISDICTION & VENUE**

1.    This is an action for damages by Plaintiff against Defendant for employment discrimination and retaliation arising under the Age Discrimination in Employment Act of 1967, 29 U.S.C. § 621-634 et seq. (the "ADEA"), Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. (1964) ("Title VII"), the Family and Medical Leave Act, 29 U.S.C. 2601 et seq. (1993) (the "FMLA"), the Florida Civil Rights Act, Fla. Stat. § 760.01 et seq. (the "FCRA"), and the Florida Whistleblower Act, Fla. Stat. 448.102 (the "FWA").

2.    Plaintiff, Marcia McManus ("McManus" or "Plaintiff") is an individual over the age of forty (40), who at all material times has been residing in Broward County, Florida.

3.    At all material times, Plaintiff was employed by Defendant in Broward County, Florida.

4.    This Court has personal jurisdiction over the Defendant, Amerijet International,

Inc. ("Amerijet" or "Defendant") because it engages in continuous and systematic business contacts within the State of Florida and maintains a substantial physical presence in the State of Florida, including the operation of its corporate headquarters in Miami-Dade County, Florida, and offices in Broward County, Florida.

5.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1343(4), under Title VII, and under the FMLA, as this is an action brought under the ADEA, Title VII, and the FMLA.

6.      The Court has supplemental jurisdiction over Plaintiff's claims under the FCRA and FWA, as these claims arise out of the same operative facts as Plaintiff's ADEA, Title VII and FMLA claims, and together, form part of the same case or controversy.

7.      Venue is proper in the Southern District of Florida, in this division, because a substantial part of the events (including discriminatory practices) giving rise to Plaintiff's claims occurred within this District and Division.

8.      Venue is also proper in this District because the Defendant is subject to personal jurisdiction therein by virtue of their substantial, continuous, and systematic commercial activities in this District. *See* 28 U.S.C. § 1391(b), (c).  Because the Defendant is subject to personal jurisdiction in this Division, it "resides" in this Division for venue purposes. *See* 28 U.S.C. § 1391(c).

9.      All conditions precedent to the filing of this lawsuit have occurred, have been waived or have been performed, including but not limited to Plaintiff exhausting her administrative remedies by complying with the statutory prerequisites of filing a timely charge of discrimination against the Defendant with the United States Equal Employment Opportunity Commission ("EEOC") on June 25, 2020.

10.     The EEOC issued its Notice of Right to Sue to Plaintiff on May 13, 2021.

**GENERAL ALLEGATIONS**

11.     McManus is a black female of Indian national origin and over the age of forty (40).

12.     McManus was an employee of Defendant for nearly twenty-three (23) years until she was suddenly and wrongfully terminated by Defendant on December 18, 2019, because of and on the basis of her age, sex, color and race, and in retaliation for making complaints of a hostile work environment, reporting illegal activities to Defendant's management, and based on her requests for leave under the FMLA to care for her ill mother.

13.     On September 8, 2019, McManus sent an email to Defendant's Human Resources Department advising them that she was written up four (4) times in two weeks without justification.

14.     McManus never received a negative write-up from Defendant in the previous twenty-two (22) years under various leadership teams.

15.     McManus had always received excellent reviews from the Defendant during her performance evaluations.

16.     In fact, just 19 days before her termination, McManus' supervisor sent her a text message stating, "I know praise is in short supply here at times, but I am thankful for what you do."

17.     The write-ups began the day before McManus requested a meeting and was scheduled to meet with the Defendant's CEO to discuss low morale in the crew scheduling department, specifically how the COO, Brian Beach was hostile, passive aggressive, and harassing to me and other managers in the workplace.

18.     This was one of many complaints made by McManus to the Defendant about the unfair treatment, bullying, and unpleasant interactions with my supervisors.

19.     McManus' complaints were never properly investigated by the Defendant in violation of their own procedures.

20.     Instead of properly investigating McManus' Complaints, the Defendant, through its attorney, provided a termination verification email to McManus clearly stating, "your employment in that position was terminated based on a decision to make a change in the position."

21.     Defendant falsely advised McManus that the reason for her termination was because they wanted to make a change in her position.

22.     Following her termination, McManus learned that the Defendants' COO, Brian Beach wanted a black woman, Sheila Guillaume from another department to replace McManus so that Defendant could avoid a claim of discrimination.

23.     Ms. Guillaume was assigned to take over some of McManus' job duties until a permanent replacement was found.

24.     Defendant eventually hired a younger white male to fill McManus' position.

**Defendant's Hostile & Discriminatory Work Environment**

25.     McManus consistently complained to Defendant about her unfair treatment, bullying, and unpleasant interactions with her supervisors.

26.     When McManus went to the HR department and her managers, McManus' complaints were never properly investigated by the Company in violation of their own procedures.

27.     In January 2019, when McManus returned from her Christmas vacation, there was an elf hanging from a string from her office ceiling, similar to a lynching.

28.     McManus was advised by the Defendant's Director of Operations, Steven Mathis, that this was done by him as a joke.

29.     McManus perceived this as being racist but did not speak up or report to HR that

she was offended because of her fear of being retaliated against and losing her job.

30.     This was not the first time Mr. Mathis referenced a hanging in McManus' office.

31.     There were two (2) strings hanging from the ceiling in McManus' office because the previous employee in the office had an airplane hanging from the ceiling and never removed the string.

32.     One day, Mr. Mathis entered McManus' office and she complained of the stress she had from additional reports, deadlines, and the short staff for Crew Scheduling.

33.     Steven Mathis looked up at the 2 strings and said to her, "you could hang yourself."

34.     In April 2019, Ms. McManus reported another incident to Defendant's Human Resources regarding Steven Mathis.

35.     Mr. Mathis brought a white male employee who was not a Manager into McManus' office.

36.     Mr. Mathis was demeaning after the employee asked McManus if she could do a favor for him.

37.     Mr. Mathis responded by saying that the other employee should not ask her for a favor but tell McManus what to do and what needs to be done.

38.     The white male employee responded by stating that he was trying to be diplomatic.

39.     In fact, the white male employee later apologized to McManus for the way Mr. Mathis spoke to her during the incident.

40.     Mr. Mathis apologized after the incident was reported to Defendant's Human Resources Department.

41.     However, this began a pattern of retaliation by the Defendant against McManus which included various write ups, unpleasant interactions, and hostility.

42.     Following the incident with Mr. Mathis, the Defendant's COO, Mr. Beach sent an email to McManus and others stating there was a "red dot on their foreheads" which was both racist because Ms. McManus is a black female with Indian descent and threatening referring to a gun pointed at her forehead.

43.     The threat of losing her job was made by Mr. Beach because McManus' department could not account for a $300,000 excess in the budget report.

44.     After researching the budget issue, McManus sent an email to Mr. Beach explaining that two (2) months' accruals were placed in one month's budget report by the Accounting Department in error.  Accounting agreed to fix the error promptly.

45.     Instead of Mr. Beach praising McManus' efforts in finding and having Accounting correct the $300,000 mistake, he completely disregarded the email she sent that identified the error.

46.     McManus continued working in fear with the daily "red dot" target on her forehead, something she brought to the attention of Defendant's Human Resources Department in email correspondence, without it being addressed.

47.     During McManus' employment, Defendant allowed a hostile work environment filled with use of foul language, harassment and discrimination against females and non-white employees, and consistently ignored complaints made by McManus of such mistreatment.

48.     A few months after McManus' termination, on April 17, 2020, the Defendant found it necessary to distribute a memo reminding employees of the policy for Respectful and Professional Conduct.

49.     Despite this memo, the Defendant's executives and managers acted unprofessional, and complaints were not addressed as stated in the memo.

50.     As stated in the memo regarding Respectful and Professional Conduct, Amerijet

claims they have a zero-tolerance policy for all employees of the company if not followed.

51.     This includes the use of discriminating language and intimidation which can lead up to termination.

52.     Yet Defendant's COO, Brian Beach authorized a hostile work environment to exist and ignored the Defendant's memo, which also included a policy of refraining from using profanity.

53.     Defendant's COO, Mr. Beach used profanity in emails, threatened employees, and made racist remarks to employees.

54.     Defendant gave no consequence to Mr. Beach after McManus reported him to the Human Resources Department and the CEO.

55.     Defendant is liable for the racist and sexist remarks and actions of their Management team including the COO, Brian Beach.

56.     Defendants Director of Operations, Mr. Mathis also made other sexist and racist remarks and was never disciplined by the Defendant.

57.     Mr. Mathis referred to a female Iranian employee as "very hot" and that he would "leave her to" Captain Nader Daily and Alex Tabrizi, Amerijet male pilots from Iran, who shared the same race, color, and ethnicity as the female employee.

58.     Additionally, Mark Bostic, a black male, applied for Defendant's Crew Scheduler position in 2019, for which he was qualified.

59.     McManus emailed Defendant's Human Resources Department and the Defendant's Chief Pilot recommending Mr. Bostic for the position and explaining how he was more qualified than a white female candidate the Defendant was considering for the position.

60.     Defendant's Chief Pilot said Mr. Bostic was not hired because he had difficulties

connecting to the Zoom meeting for the interview for the position.

61.     McManus reminded the Defendant that connecting to Zoom was not part of the interview process, and that the interviewers all liked Mr. Bostic during the interview.

62.     McManus reminded Defendant's Chief Pilot that they both had issues with logging into Zoom which was the reason McManus, and the Chief Pilot went to the Human Resource's conference room to join the Zoom session.

63.     The white female candidate had been a Crew Scheduler before but had a history of changing jobs every few months.

64.     The Company overlooked Mr. Bostic, the more qualified candidate, because he was black, in favor of a white female.

65.     McManus' consistent complaints of harassment and discrimination resulted in the Defendant retaliating against her by terminating her from her position with the Defendant.

## McManus Experienced Intentional Disparate Treatment

66.     Throughout McManus' employment with Defendant, Defendant showed a pattern of discriminatory behavior and disparate treatment.

67.     As a black female Manager with mixed Indian descent and over the age of forty (40), McManus felt compelled by the company to work twice as hard as other white Managers in similar positions.

68.     The Company almost doubled in size over the final few years of McManus' employment, and as a result McManus' workload continued to increase.

69.     McManus repeatedly asked her supervisor and executives for additional help as McManus was required to work as both the day and night Manager responsible for her department 24 hours per day, 7 days per week.

70.     McManus' requests to Defendant included requests to increase staffing within her department.

71.     In 2017, McManus advised Defendant's Director of Operations, Steven Mathis that she was doing the job of six (6) additional people and that she needed additional help and a pay raise to the appropriate market value for someone in her position with her experience.  McManus was denied help and denied a pay raise.

72.     The Defendant's dispatch department had similar responsibilities requiring 24 hours per day operation, yet the Defendant employed two white Managers for the dispatch department who were assigned to share the workload.

73.     McManus' repeated requests for additional help were ignored and refused by the Defendant's COO, Mr. Beach.

74.     McManus requested help several times over several months both verbally and in emails, and the requests went ignored.

75.     Defendant's COO, Mr. Beach began to exclude McManus from training and Crew Scheduling meetings despite her being the sole manager of the department.

76.     Ms. McManus notified Mr. Beach of her exclusion from these meetings and requested that she be included.  These requests went ignored.

77.     McManus continued to make requests to Mr. Beach to "reset" the Crew Scheduling department and made attempts to address issues with payroll and training.

78.     Ms. McManus was ignored by executives and treated unfairly in comparison to white females and other white male executives.

79.     After her termination, McManus' job duties- crew scheduling, payroll, roster and projects, and pilot cash out, amongst other duties, were split between six (6) employees.

80.     After McManus was terminated, Amerijet doubled the Crew Scheduling team from eight (8) to sixteen (16) employees with six (6) positions dedicated to payroll, rostering, and crew hotel, and two (2) additional crew schedulers.

81.     McManus also complained to Defendant's management about the deficiencies in their Geneva software used for payroll.

82.     After McManus' termination in 2019, Defendant finally took the Geneva software deficiencies seriously, and started the process of employee training to change the Geneva outdated software to Aims software.

83.     The Aims software is better for reports and pilot payroll and will correct the Geneva system deficiencies as reported by McManus.

84.     Defendant employed a pattern of writing up female managers for being late to meetings, while forgiving white male employees for the same lateness.

85.     McManus received a write up for being five (5) minutes late to a meeting, and at the same time received three (3) other frivolous write ups which she disputed.

86.     Defendant could have combined the three (3) occurrences but by separating the write-ups, Defendant attempted to magnify the number of write ups received by McManus to justify her termination.

87.     McManus addressed these write ups with Amerijet's CEO during a brief one-hour meeting and the CEO was not interested in discussing the write-ups or their frivolous nature.

88.     Brian Beach, the COO of Amerijet and a white male was thirty (30) minutes late to a Union discussion meeting.

89.     Mr. Beach apologized for being late because he claimed he forgot about the meeting.

90.     Mr. Beach never received a write up from Defendant for being late, yet McManus was written up for being merely five (5) minutes late to a meeting.

91.     Mr. Gonzales, Defendant's Chief Pilot was late to meetings on October 8, 2019, and October 11, 2019, yet he never received a write up.

92.     When McManus discussed her lateness with the Defendant's CEO, he said everyone was expected to be on time regardless of if you were an Executive.

93.     Defendant wrote up two female Mangers, including McManus for being late at a separate meeting in Flight Operations**.**

94.     Ms. Alizo, a Training Manager, and white female was written up to give the false impression that Defendant was not bias against McManus.

95.     However, Ms. Alizo was never written up for more serious complaints McManus made about Ms. Alizo to defendant for Ms. Alizo failing to provide timely training information to process rosters for pilot contract deadlines.

96.     Ms. Alizo being a white female Manager and Mr. Beach's favorite Manger was allowed to give reasons or excuses to delay the information needed by Crew Scheduling each month and her excuses were accepted by the COO, Mr. Beach, Director of Operations, Mr. Mathis, and the Chief Pilot, Mr. Gonzalez.

97.     When Ms. McManus, a Black/Indian female Manager gave an explanation about any report delays it was never accepted regardless of whether she was short staffed, reports had to be done manually, or she was helping in Crew Scheduling because someone was out sick.

98.     As Black/Indian female Manager, McManus was not afforded the same privileges as the white male & white female Mangers.

99.     McManus received a write up because she did not come to work on September 3,

2019, the same day a hurricane warning was lifted in South Florida, and when she believed she was given permission by Defendant's Director of Operations, Steven Mathis to use paid time off.

100.    Mr. Mathis approved McManus' time off via email.

101.    McManus was never credited for the extra time she put in from August 30, 2019 – September 3, 2019, due to the hurricane warning at issue.

102.    McManus worked extra hours in the office and away from the office on her laptop helping Defendant's Crew Scheduling to get the airplanes out of Miami and back during the hurricane warning.

103.    Defendant had a Skeleton pilot crew since the pilots wanted to stay in Miami with their families, and it was extremely difficult to crew the flights since they were not returning to Miami for several days.

104.    McManus asked the Defendant to review her laptop history and company phone log to verify her work to no avail.  McManus also asked to use her personal or vacation time to cover the day, and the Defendant refused, and she still received a write up.

105.    During the same time another employee of the Defendant, a white male pilot, was on reserve duty and was scheduled to move an airplane before the hurricane hit Florida.

106.    The pilot refused to perform the flight and did not show up to work.

107.    Rather than receive a write up or any discipline, the pilot's status was updated to unavailable by Defendant, which should have resulted in a six (6) hour pay deduction for the two (2) days he refused to fly.

108.    Mr. Mathis, Defendant's Director of Operations, removed the unavailable status for the pilot who was then credited for three (3) hours of pay, while being away from work.

109.    There was no consequence from the Defendant to the white male pilot for his failure

to show up at work.

**Defendant's Disparate Age Discrimination**

110.    After the Defendant was purchased in 2016, and new executives and managers were put in place, between 2017 and March 2021, a total of seventeen (17) Managers, Directors, and Vice Presidents, all over the age of forty (40), with an average of eighteen (18) years of service, were terminated or involuntary resigned.

111.    The entire original Executive Team Management are no longer with Amerijet.

112.    After the purchase in 2016, Amerijet wanted new management and executives and to reduce the cost of salary with younger employees with less experience compared to the average of eighteen (18) years of service pay by the older Management team.

113.    Amerijet's actions disproportionately affected employees over the age of 40.

114.    The following chart shows all management employees who were terminated or involuntarily resigned between 2017 to March 2021, all of whom are over the age of 40.

## 2017 to March 2021

| | NAME | TITLE | BLACK / WHITE MALE / FEMALE | YEARS OF SERVICE | DATE OF SERVICE |
|---|---|---|---|---|---|
| | *All 18 Management employees were over 40 Years of Age* | | | | |
| | *They were either Terminated of Involuntary resigned* | | | | |
| 1 | Norman "Ed" Cook | Chief Pilot | WHITE / M | 15 Years of SVC | 2003-2018 |
| 2 | Robert Mencel | Director Of Flight Operations | WHITE / M | 12 Years of SVC | 2006-2018 |
| 3 | Rick Clapper | Director of Maintenance | WHITE / M | 27 Years of SVC | 1991-2018 |
| 4 | Anthony Alberico | VP of Hub Operations | WHITE / M | 14 Years of SVC | 2004-2018 |
| 5 | Mark Stewart | VP Airline Division | WHITE / M | 20 Years of SVC | 1997-2017 |
| 6 | Julio Berard | Sr Director Aircraft Maintenance | WHITE / M | 17 Years of SVC | 2000-2017 |
| 7 | Carlo Postell | Sr Director Quality control | **BLACK/ M** | 19 Years of SVC | 1999-2018 |
| 8 | Pamela Rollins | Sr VP Business Development | WHITE / F | 39 Years of SVC | 1979-2018 |
| 9 | Jennifer Torlone | CIO/ Sr Director Technology & Info | WHITE / F | 7 Years of SVC | 2011-2018 |
| 10 | Rupert Jones | Training Manager | WHITE / M | 2 Years of SVC | 2016-2018 |
| 11 | James Foxworth | Standards Manager | WHITE / M | 14 Years of SVC | 2005-2019 |
| 12 | John Olin | Sr VP for Corporate Strategy | WHITE / M | 1 Years of SVC | 2018-2019 |
| 13 | Marcia McManus | Sr CrewScheduling Manager | BLACK / F | 23 Years of SVC | 1996-2019 |
| 14 | Joan Canny | Sr VP & General Council | WHITE / F | 10 Years of SVC | 2010-2020 |
| 15 | Derry Huff | VP of Sales & Marketing | WHITE / M | 31 Years of SVC | 1989-2020 |
| 16 | John Nash | Chief Financial Officer | WHITE / M | 18 Years of SVC | 2002-2020 |
| 17 | Daniel Grimes | Chief Operating Office (ITN) | WHITE / M | 8 Years of SVC | 2012-2020 |
| 18 | Isis Suria | VP Human Resources | WHITE / F | 21 Years of SVC | 2000-2021 |

115.    Jose Campio, a Crew Scheduler, over the age 40 was discriminated against by Amerijet.

116.    Mr. Campio is over 60 years old and originally worked in Dispatch for approximately 10 years.

117.    Mr. Campio requested and received a transfer to Crew Scheduling and was there for approximately over 7 years.

118.    In 2019, Mr. Campio applied by requesting a transfer to go back to Dispatch because Dispatchers were given a new pay scale higher than Crew Scheduling.  There were a few positions open and advertised.

119.    Mr. Campio's request was not approved for the transfer for the open Dispatch position by Defendant, as advised to Mr. Campio by Human Resources Manager, Tiffany Powell.

120.    Mr. Campio was qualified because he held the exact job for years prior and had great reviews from the Defendant.

121.    Amerijet chose to hire new Dispatchers younger than Mr. Campio at a lower pay scale.

122.    Amerijet discriminated against Mr. Campio because of his age over 40 and pay scale.

123.    John Rupert, Amerijet's former Training Manager, over the age of 40, was terminated by the COO, Brian Beach in 2018, and replaced by a younger unqualified female, Junel Alizo who was formerly the Training Specialist.

124.    Mr. Rupert was a retired pilot, and the Training Manager position was typically held by someone with a pilot qualification to effectively communicate with the pilots.

125.    In 2018, Mr. Beach and the Director of Operations, Mr. Mathis tried to promote

Ms. Alizo from Training Specialist to Director of Training after Mr. Rupert's termination, which included a $40k pay raise.

126.     However, the position was only advertised as Manager of Training.

127.     The company falsely advertised the position as Manager of Training to get less applicants to apply.  A Director of Training advertisement would have attracted more qualified candidates to apply.

128.     The FAA eventually refused to approve Ms. Alizo as Director of Training since she was not qualified.

129.     As a result, Mr. Beach (who consistently referred to Ms. Alizo as "Princess") told the Vice President of Safety, Mr. Richard Carpenter to rewrite the job description for the position of Training Manger to meet Ms. Alizo's qualifications for approval with the FAA.

130.     Mr. Carpenter complied, rewrote the Training Manager job description tailored to Ms. Alizo as directed by Mr. Beach.

131.     The FAA then approved the Manager of Training title for Ms. Alizo, and she received a $20k pay raise from Defendant.

**McManus' Request for FMLA Leave**

132.     Immediately before her termination, McManus spoke to her team members and supervisor about her mother's serious medical illness and hospitalization.

133.     McManus requested FMLA leave to be by her mother's side during her mother's illness and transition to death.

134.     McManus' request for FMLA was denied by the Company's attorney and the Vice President of Human Resources.

135.     Instead, McManus was terminated from her position with the Company without

warning, less than one (1) week before Christmas, with her mother in her final days in the hospital.

136.    While attending to her dying mother, Defendant cut off McManus' livelihood leaving her severely emotionally distressed, practically unable to find work during a holiday season, and to care her mother, who tragically passed away less than 2 weeks later.

137.    McManus was retaliated against by Defendant when she was terminated from her employment with the Company based on her request for FMLA leave to care for her dying mother.

**Retaliation for McManus' Reports of Illegal & Safety Concerns**

138.    After one of their exclusive meetings, McManus was told of a new Pilot Training Procedure to save money and McManus objected to the Defendant due to safety concerns.

139.    McManus was overruled and followed the order as directed by the Defendant.

140.    This new procedure eventually led to McManus' whistleblower complaint after one of her safety fears related to the new program materialized and compromised pilot safety.

141.    Those complaints did not result in changes to this conduct but did result in McManus suddenly being "written up" for seemingly minor slights tolerated with Defendant's other employees.

142.    McManus' complaints about safety violations and FAA compliance, which was part of her job, strongly influenced senior managers to terminate her.

143.    McManus was also terminated for raising concerns with Defendant regarding FAA safety issues related to pilot fatigue.

144.    The FAA regularly conducts audits and investigations if a company reports too many cases of pilot fatigue.

145.    There were occasions when a pilot was out due to reports of fatigue, and McManus was asked by the Defendant's Chief Pilot to change the reporting for that pilot from fatigue/sick

day to a blank day.

146.    McManus documented these changes by emailing the Defendant's Chief Pilot that his request to make the change was done.

147.    Eventually, the Defendant's Chief Pilot requested that McManus remove the "fatigue" category altogether so that there was no reporting of pilot fatigue by Defendant.

148.    McManus made the Defendant aware that she did not agree with these requests as they presented a serious safety issue and were obvious attempts to avoid FAA regulation.

149.    Scott McGlynn, a white Manager reported Amerijet to the FAA for safety issues. Instead of terminating Mr. McGlynn for his whistleblowing, like the Defendant did to McManus, Defendant ordered Mr. McGlynn to work from home permanently.

150.    Mr. McGlynn has no duties for the Defendant yet continues to get paid by the Defendant to sit home.

151.    As of March 21, 2021, Mr. McGlynn is still on the Defendant's payroll with full pay making over six figures.

152.    Unlike Mr. McGlynn, McManus was terminated by the Defendant because of her objection to Defendant's safety policies and violations of FAA regulations.

### COUNT I
### VIOLATION OF THE AGE DISCRIMINATION IN EMPLOYMENT ACT
### 29 U.S.C. § 621 ET SEQ.

153.    Plaintiff incorporates and re-alleges paragraphs 1 through 152 above as if fully set forth herein.

154.    At all relevant times, Plaintiff was over 40 years of age, see 29 U.S.C. § 631(a).

155.    At all relevant times, the Defendant has been, and continues to be, an employer within the meaning of the ADEA, 29 U.S.C. § 630.

156.    At all relevant times, the Defendant has been engaged in interstate commerce within the meaning of the ADEA, and has employed, and continues to employ, fifteen or more employees.

157.    According to 29 U.S.C. § 623(a), "It shall be unlawful for an employer (1) to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age; (2) to limit, segregate, or classify his employees in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's age."

158.    Defendant intentionally and directly discriminated against Plaintiff on the basis of her age in violation of the ADEA.

159.    Defendant discharged Plaintiff from her employment with Defendant and because of her age, in violation of the ADEA.

160.    Defendant classified employees in a way that deprived Plaintiff, and others similarly situated, of employment opportunities because of the employees' ages, by replacing older employees with younger individuals, in violation of the ADEA.

161.    As a proximate result of Defendant's age discrimination, Plaintiff was terminated from her employment, deprived of the opportunity to earn wages, and deprived of the opportunity to earn employment benefits.

WHEREFORE, Plaintiff, MARCIA MCMANUS demands judgment against Defendant, AMERIJET INTERNATIONAL, INC. for lost wages, back pay, front pay, employment benefits, and other compensation lost to her as a result of Defendant discriminating against her on the basis of her age, liquidated damages, wages, lost employment benefits, and other compensation lost to her as a result of Defendant discriminating against her on the basis of her age, reasonable attorney's

fees, expert witness fees, expenses, and costs of this action, and of prior administrative actions, prejudgment interest, and any such other relief that this Court deems just and appropriate.

## COUNT II
### VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964
### 42 U.S.C. § 2000E ET SEQ. (1964)

162.    Plaintiff incorporates and re-alleges paragraphs 1 through 152 above as if fully set forth herein.

163.    At all relevant times, Plaintiff was a black female of Indian descent.

164.    At all relevant times, the Defendant has been, and continues to be an employer within the meaning of Title VII.

165.    Defendant intentionally and directly discriminated against Plaintiff on the basis of her race, color, sex, and national origin in violation of Title VII.

166.    Defendant treated Plaintiff differently from other employees based upon and because of her race, color, sex, and national origin in violation of Title VII.

167.    Defendant discharged Plaintiff from her employment with Defendant because of her race, color, sex, and national origin in violation of Title VII.

168.    As a proximate result of Defendant's discrimination, Plaintiff was terminated from her employment, deprived of the opportunity to earn wages, and deprived of the opportunity to earn employment benefits.

WHEREFORE, Plaintiff, MARCIA MCMANUS demands judgment against Defendant, AMERIJET INTERNATIONAL, INC. for lost wages, back pay, front pay, employment benefits, and other compensation lost to her as a result of Defendant's discrimination, liquidated damages, punitive damages, wages, lost employment benefits, and other compensation lost to her as a result of Defendant's discrimination, reasonable attorney's fees, expert witness fees, expenses, and costs

of this action, and of prior administrative actions, prejudgment interest, and any such other relief that this Court deems just and appropriate.

**COUNT III**
**VIOLATION OF FLORIDA CIVIL RIGHTS ACT OF 1992**
**FLA. STAT. 760.01 – 760.11**

169.  Plaintiff incorporates and re-alleges paragraphs 1 through 152 above as if fully set forth herein.

170.  At all relevant times, Plaintiff was a black female of Indian descent over the age of forty (40) and is a person within the meaning of the FCRA, *Fla. Stat.* 760.02.

171.  At all relevant times, the Defendant has been, and continues to be an employer within the meaning of the FCRA, *Fla. Stat.* 760.02.

172.  At all relevant times, the Defendant employs 15 or more employees for each working day in each of 20 or more calendar weeks in the current or preceding calendar year.

173.  According to *Fla. Stat.* 760.10(1), "It is an unlawful employment practice for an employer: (a) To discharge or to fail or refuse to hire any individual, or otherwise to discriminate against any individual with respect to compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, pregnancy, national origin, age, handicap, or marital status; (b) To limit, segregate, or classify employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities, or adversely affect any individual's status as an employee, because of such individual's race, color, religion, sex, pregnancy, national origin, age, handicap, or marital status." *Id*. (emphasis added).

174.  Defendant intentionally and directly discriminated against Plaintiff on the basis of her race, color, sex, national origin and age in violation of the FCRA.

175.    Defendant discharged Plaintiff from her employment with Defendant and because of her race, color, sex, national origin, and age in violation of the FCRA.

176.    As a proximate result of Defendant's discrimination, Plaintiff was terminated from her employment, deprived of the opportunity to earn wages, and deprived of the opportunity to earn employment benefits.

WHEREFORE, Plaintiff, MARCIA MCMANUS demands judgment against Defendant, AMERIJET INTERNATIONAL, INC. for lost wages, back pay, front pay, employment benefits, and other compensation lost to her as a result of Defendant discriminating against her, liquidated damages, punitive damages, wages, lost employment benefits, and other compensation lost to her as a result of Defendant discriminating against her, reasonable attorney's fees, expert witness fees, expenses, and costs of this action, and of prior administrative actions, prejudgment interest, and any such other relief that this Court deems just and appropriate.

### COUNT IV
**VIOLATION OF THE FAMILY AND MEDICAL LEAVE ACT
29 U.S.C. 2601 ET SEQ. (1993)**

177.    Plaintiff incorporates and re-alleges paragraphs 1 through 152 above as if fully set forth herein.

178.    At all relevant times, Plaintiff was a covered employee under the FMLA.

179.    At all relevant times, the Defendant was a covered employer under the FMLA.

180.    Prior to her termination, Plaintiff requested FMLA leave from her employment with Defendant to care for her immediate family member, her mother.

181.    Defendant discriminated against Plaintiff and terminated Plaintiff from her employment with Defendant based upon her request for FMLA leave.

182.    As a proximate result of Plaintiff's request for FMLA leave, Plaintiff was

terminated from her employment, deprived of the opportunity to earn wages, and deprived of the opportunity to earn employment benefits.

WHEREFORE, Plaintiff, MARCIA MCMANUS demands judgment against Defendant, AMERIJET INTERNATIONAL, INC. for lost wages, back pay, front pay, employment benefits, and other compensation, liquidated damages, interest, wages, lost employment benefits, and other compensation lost to her, reasonable attorney's fees, expert witness fees, expenses, and costs of this action, and of prior administrative actions, prejudgment interest, and any such other relief that this Court deems just and appropriate.

## COUNT V
## VIOLATION OF FLORIDA'S WHISTLEBLOWER ACT
## FLA. STAT. §448.102

183. Plaintiff restates and realleges paragraphs 1 through 152 above as if fully set forth herein.

184. Plaintiff was an employee of Defendant as defined by Fla. Sta. §448.101

185. Defendant was employers and supervisors of Plaintiff as defined by Fla. Stat. §448.101.

186. Plaintiff reported to the Defendant, in writing, various activities, policies, and practices of the Defendant which were in violation of laws, rules and regulations.

187. Plaintiff threatened to disclose, to the appropriate governmental agencies activities, policies, and practices of the Defendant which were in violation of laws, rules, and regulations.

188. Plaintiff objected to, and refused to participate in, the activities, policies, and practices of the Defendant which were in violation of a laws, rules, and regulations.

189. Defendant had a reasonable opportunity to correct the activities, policies, or practices which were in violation of laws, rules and regulations as reported to them by Plaintiff.

190.    Defendant discharged Plaintiff from her employment with Defendants because of her reporting, threat to disclose, and objection to Defendant's activities, policies, and practices which were in violation of a laws, rules, and regulations.

191.    Defendant's actions have damaged Plaintiff.

192.    Plaintiff is entitled to lost wages, lost benefits, compensatory damages, and attorneys' fees and costs because of Defendant's retaliatory personnel action in terminating her from her employment.

WHEREFORE, Plaintiff, MARCIA MCMANUS prays for judgment against the Defendant, AMERIJET INTERNATIONAL, INC. for her damages, including but not limited to lost wages, lost benefits, compensatory damages, pre-judgment interest, attorneys' fees, and costs, together with such other relief this Court deems just and proper.

## JURY DEMAND

193.    Plaintiff demands a trial by jury on all counts and issues eligible.

Dated this 5th day of August 2021.

Respectfully submitted,

**SKS LEGAL GROUP, PLLC**
*Counsel for Plaintiff, Marcia McManus*
101 NE 3rd Ave, Suite 1500
Fort Lauderdale, FL 33301
Telephone No.: (954) 637-3713
Email:  rstreit@skslegalgroup.com

By:   */s/ Robert C. Streit*
          Robert C. Streit
          Florida Bar No. 70780