**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO.: 0:21-cv-61617-DPG/JMS**

MARCIA MCMANUS,

      Plaintiffs,

v.

AMERIJET INTERNATIONAL, INC.

      Defendant.

_____/

**<u>DEFENDANTS' FULLY DISPOSITIVE MOTION FOR SUMMARY JUDGMENT AND
INCORPORATED MEMORANDUM OF LAW</u>**

Defendant, AMERIJET INTERNATIONAL, INC. ("Amerijet"), pursuant to Fed. R. Civ. P. 56, move for summary judgment against Plaintiff MARCIA MCMANUS ("Plaintiff") on all counts of the Second Amended Complaint ("Amended Complaint") [ECF No. No. 89] and states:[1]

## INTRODUCTION

Plaintiff, a Black female, claims that she was discriminated by Amerijet on the basis of her race (Counts II and V) and gender (Counts I and IV), and that she was retaliated against for engaging in "protected activity" by allegedly complaining about a hostile work environment (Counts III, VI, and VII). What will become abundantly clear is that Plaintiff's employment ended because she could not meet the expectations of Amerijet's new management team. Plaintiff was accustomed to an old way of doing things. When Amerijet was purchased in 2016, the old way ended. Employees who could not adapt to the new way struggled, and eventually, were separated. Plaintiff was one such employee. She failed to meet the reasonable and legitimate expectations of the new management team, and therefore, she was terminated.

Plaintiff does not provide any direct evidence of discrimination. Rather, her entire discrimination claims rely on one central allegation: three White males, whom she alleges were similarly situated comparators, were not terminated over an issue for which Plaintiff was ultimately terminated. Those three individuals -- Amerijet's Chief Operating Officer, Director of Operations (an active pilot), and Chief Pilot (an active pilot) -- cannot, as a matter of law, qualify as Plaintiff's comparators. Plaintiff was in charge of scheduling pilots to fly Amerijet's airplanes and processing pilot payrolls, yet she asks this Court to find that she was similarly situated to the Company's COO, who is Amerijet's second-highest ranking officer, and two of its highest-ranking pilots. Moreover, the evidence

---

[1] Pursuant to S.D. Fla. L.R. 56.1(a), Amerijet incorporate herein its contemporaneously filed Statement of Undisputed Material Facts ("Facts"), cited herein as "SOF ¶__".

demonstrates that despite Amerijet giving her plenty of time to improve her performance, Plaintiff, who was Amerijet's Scheduling Manager, was unable to perform the most basic function of her role – scheduling pilots in an efficient and cost effective manner.

With respect to her retaliation claims, Plaintiff admits that she never reported to anyone at Amerijet that she felt she was a victim of sex or race discrimination. Instead, her entire retaliation claims rest on one email in which Plaintiff stated that Amerijet's COO subjected ***many*** managers to a hostile environment. She does not claim, or even imply, that the COO's hostile treatment was directed at Black or female employees, or that it was motivated by any discriminatory animus. She does not claim that she was being singled out. To the contrary, she claimed that "something is wrong if all your Managers feel they have a target on their heads." Plaintiff did, however, provide one specific example in her email of another employee who had allegedly experienced hostile treatment at the hands of Amerijet's COO. This employee was Ed Cook, a White male.

Plaintiff fails to show that Amerijet discriminated or retaliated against her for any unlawful reasons. The record provides no support for Plaintiff's claims. Therefore, Amerijet is entitled to summary judgment on all of Plaintiff's claims.

## MEMORANDUM OF LAW

### I.  Summary Judgment Standard

Summary judgment is "mandate[d]" in a case where a plaintiff "fails to make a showing sufficient

to establish the existence of an element essential to that party's case, and on which that party will bear

the burden of proof at trial."  *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986).

As the Supreme Court recognized:

> [b]y its very terms, this standard provides that the mere existence of *some* alleged
> factual dispute between the parties will not defeat an otherwise properly supported
> motion for summary judgment; the requirement is that there be no *genuine* issue of
> *material fact*."

*Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990) (quoting *Anderson v. Liberty Lobby, Inc.,* 477

U.S. 242, 252 (1986)).

### II.  Plaintiff's Race and Gender Discrimination Claims Under Title VII and the FCRA Fail As A Matter of Law

Counts I, II, IV and V of Plaintiff's Second Amended Complaint ("SAC") purport to set forth

claims for race and gender/sex discrimination under Title VII of the Civil Rights Act, 42 U.S.C. §

2000e et seq. ("Title VII") and the Florida Civil Rights Act, Fla. Stat. § 760.01 et seq. ("FCRA").

*See* ECF No. 87 at ¶¶ 62-77, 84-99.  For Plaintiff to establish a *prima facie* case of race or gender

discrimination under either Title VII or the FCRA, she must demonstrate that: (1) she belongs to

a protected class; (2) she was subjected to an adverse employment action; (3) her employer treated

similarly situated employees outside her protected class more favorably; and (4) she is qualified

to do the job.[2]  *See Carter v. City of Miami*, 870 F.2d 578, 582 (11th Cir. 1989); *Maynard v. Bd. of*

---

[2]  "[C]ourts have consistently held that the elements of a prima facie case and the analytical
framework for employment discrimination claims made under Title VII [and] the Florida Civil
Rights Act . . . are the same." *Henderson v. Dade Cty. Police Benev. Ass'n, Inc.*, No. 14-20321-
CIV-MORENO, 2014 WL 3591600, at *6 (S.D. Fla. July 18, 2014) (citing *Crawford v.
Carroll*, 529 F.3d 961, 970 (11th Cir.2008); *see also Harper v. Blockbuster Entm't Corp.* 139 F.3d
1385, 1387 (11th Cir.1998) ("The Florida courts have held that decisions construing Title VII are

*Regents of Div. of Universities of Fla. Dep't of Educ. ex rel. Univ. of S. Fla.*, 342 F.3d 1281, 1289 (11th Cir. 2003) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, (1973)).

If Plaintiff satisfies her burden to establish a *prima facie* case, Amerijet must articulate a legitimate, nondiscriminatory reason for the adverse employment action. *Walker v. NationsBank of Florida, N.A.*, 53 F.3d 1548, 1556 (11th Cir. 1995) (internal quotations omitted). This burden is "exceedingly light" because Amerijet "need only produce, not prove, a non-discriminatory reason." *Id.* If Amerijet satisfies its burden of production, Plaintiff then bears the burden of persuasion that the proffered reason for the employment action is pretextual, that is, she must prove "*both* that the reason articulated was false, *and* that discrimination was the real reason" for the employment action. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515-17 (1993).

**A.  Plaintiff cannot establish a *prima facie* case of race or gender discrimination because she has failed to identify any similarly situated employees who were treated more favorably.**

Plaintiff alleges only three employees who she claims were similarly situated to her in support of her race and gender discrimination claims: Chief Operating Officer Brian Beach ("Beach"), Director of Operations Steven Mathis ("Mathis"), and Chief Pilot Hector Gonzalez ("Gonzalez"). ECF No. 89, at ¶ 46. Plaintiff alleges that these three White, male employees were responsible for monitoring and mitigating pilot overages[3] along with Plaintiff, but only Plaintiff was terminated for a failure to control overages. ECF No. 89, at ¶¶ 46-49.

In order to establish a *prima facie* case of race or gender discrimination under Title VII, Plaintiff must identify co-workers outside of her protected class who were "similarly situated [to Plaintiff] in all material aspects." *Lewis v. City of Union City, Georgia*, 918 F.3d 1213, 1218 (11th

---

applicable when considering claims under the Florida Civil Rights Act, because the Florida act was patterned after Title VII.")) (citations omitted).

[3] "Overage" was extra pay that pilots would receive for being scheduled to fly outside of their regular schedule. SOF ¶ 32. It was like paying overtime to pilots. SOF ¶ 32.

Cir. 2019); *see also Edgerton v. City of Plantation*, No. 14-61472-CIV, 2015 WL 13311019, at *5 (S.D. Fla. Aug. 28, 2015) (quoting *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1091 (11th Cir. 2004); *Misquith v. Palm Beach Cnty. Health Care Dist.*, No. 20-CV-81123-AMC, 2021 WL 8055475, at *5 (S.D. Fla. Sept. 29, 2021).

Employees with whom Plaintiff seeks to compare herself to must have: "(1) dealt with the same supervisor, (2) been subject to the same standards, and (3) engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Drisin v. Fla. Int'l Univ. Bd. of Trustees*, No. 1:16-CV-24939, 2017 WL 3505299, at *11 (S.D. Fla. June 27, 2017), report and recommendation adopted, No. 16-CV-24939-CIV, 2017 WL 10398209 (S.D. Fla. Sept. 28, 2017). Moreover, two critical factors in determining whether Plaintiff is similarly situated to her alleged comparators are the type of expertise required by the individuals' positions as well as the differences in their jobs. *Calicchio v. Oasis Outsourcing Grp. Holdings, L.P.*, 584 F. Supp. 3d 1215, 1245 (S.D. Fla. 2021), aff'd, No. 21-12854, 2022 WL 2761720 (11th Cir. July 15, 2022) (citation omitted).

> ### i. *The jobs of all of Plaintiff's alleged comparators were vastly different than her job, and required completely different sets of responsibilities and expertise.*

### Chief Operating Officer Brian Beach

Brian Beach was the Chief Operating Officer of Amerijet. SOF ¶ 4. Beach was responsible for all ground and warehouse operations, flight operations, safety, and maintenance across the entire company, and was responsible for strategic planning of Amerijet's operations. *Id.* Beach oversaw eight separate departments, employing approximately 450 individuals. *Id.*

Beach was responsible for selecting all Required Managers under Federal Aviation Administration's ("FAA"), Federal Aviation Regulations ("FARs") 119.65, and establishing and modifying the policies, procedures, instructions, and information pertaining the requirements of

FAR 119.65. SOF ¶ 5. Beach was also responsible for allocating resources to ensure the safe and reliable operation of Amerijet's flight operations, which included implementing a Safety Management System ("SMS") in conjunction with Amerijet's Vice President of Safety and Airline Security. *Id.* Beach managed the Chief Pilot with respect to programs, standards, and staffing of the pilot workforce, and was responsible for directing the overall development, control, and management of the Director of Quality Control, including the Quality Control Department budget. *Id.*

The following eight Amerijet employees directly reported to Beach: Vice President of Airport Ground Operations, Vice President of Safety and Special Projects, Vice President of Domestic Station Operations, Director of Operations, Director of Quality Control, Director of Planning and Material Services, Director of Maintenance, and Director of HUB Operations. *Id.* Beach reported to Vic Karjian, Amerijet's Chief Executive Officer. SOF ¶ 6.

### Director of Operations Steven Mathis

Steven Mathis was Amerijet's Director of Operations. SOF ¶ 8. The Director of Operation position is one of five "Required Managers" that the Federal Aviation Administration ("FAA") requires every airline to maintain. *Id.* Mathis was responsible for overseeing day-to-day operations, managing the Flight Department, Crew Scheduling Department, the Training Department, the Operations Control Center, the pilots, and the loadmasters. SOF ¶ 9. Mathis held operational control, which meant he was responsible for the initiation and continuation of every flight, had ultimate responsibility for ensuring that every flight could be initiated and flown safely to its destination, and had authority to ground or divert any flight. *Id.* Mathis was also responsible for ensuring the pilots complied with FAA regulations, and was responsible for ensuring that pilots and loadmasters were properly trained and met all FAA requirements. *Id.* Additionally, Mathis had

authority to establish and modify the policies, procedures, instructions and information for approximately 35 areas of Amerijet's operations. *Id.*

Mathis oversaw five separate departments, employing approximately 200 individuals. SOF ¶ 10. Five management level employees directly reported to Mathis, including the: Operations Control Center Manager, Scheduling Manager, Training Manager, Load Master Manager, and Chief Pilot. *Id.* Mathis reported directly to COO Brian Beach. SOF ¶ 13.

Mathis also continued to pilot airplanes for Amerijet and served as a flight instructor. SOF ¶ 11. Mathis was also a Line Check Airman and Simulator Check Airman. *Id.* These positions are authorized by the FAA to provide FAA-required check rides to pilots, which ensure that the pilots remain qualified and proficient in their skills. *Id.* To become a Check Airman, pilots must undergo training and observations by the FAA, and the FAA issues the pilot a qualification letter. *Id.*

Mathis was also the Air Crew Program Designee ("ACPD"), which allowed him to issue licenses to pilots to fly the 767 aircraft, which Amerijet operates. SOF ¶ 12. FAA approval is necessary to become certified as an ACPD, which requires experience as flight instructor, as well as training with, and observations by, the FAA. *Id.*

## Chief Pilot Hector Gonzalez

Hector Gonzalez was Amerijet's Chief Pilot. SOF ¶ 16. The Chief Pilot position was one of the five Required Managers required by the FAA. SOF ¶ 17. Gonzalez was responsible for supervising all of Amerijet's pilots. SOF ¶ 18. He had responsibility for making sure pilots reported to work on time, had all their required equipment, received enough rest, and followed proper procedure in the airplane. *Id.* Gonzalez was responsible for informing pilots of changes to FARs or Amerijet procedures and ensuring pilots complied with all relevant FAA regulations. *Id.* He was responsible for ensuring pilots received all necessary training and remained current on their FAA-required

qualifications. *Id.* Gonzalez was also responsible for assisting the Director of Operations with formulating policies and procedures governing flight crews. *Id.*

Gonzalez directly supervised approximately 89 pilots. SOF ¶ 19. Gonzalez continued to pilot airplanes for Amerijet while he served as Chief Pilot. *Id.* Gonzalez was also a flight instructor, and was a Line Check Airman and Simulator Check Airman. *Id.*

### Crew Planning and Scheduling Manager Marcia McManus

Plaintiff was Amerijet's Crew Planning and Scheduling Manager. SOF ¶ 15. Plaintiff managed the Crew Scheduling Department and was responsible for pilot rosters, which involved creating pilots' flight schedules, and generating pilot payrolls. *Id.* Plaintiff did not have any responsibilities for any department other than the Crew Scheduling Department. *Id.* The only individuals who reported to Plaintiff were approximately 10-12 crew schedulers, who were responsible for assisting with creating pilot rosters and flight schedules. *Id.* Plaintiff did not supervise or manage any management-level employees. *Id.* Plaintiff was not a pilot. *Id.* Plaintiff reported to Mathis from 2018 until mid-2019, at which time Plaintiff began reporting to Gonzalez. SOF ¶ 16. Gonzalez reported to Mathis. SOF ¶ 19.

> ii. *Plaintiff's alleged comparators were not similarly situated, and therefore, Plaintiff fails to establish a prima facie case of race or gender discrimination.*

Beach, Mathis, and Gonzalez each had vastly different jobs than Plaintiff, which required completely different sets of expertise and qualifications. Beach was a C-level officer of Amerijet who was responsible for multiple departments, as well as strategic operational planning. SOF ¶ 4. Mathis was a director-level employee as well as a pilot. SOF ¶ 8. He was one of five "Required Managers" in an FAA-regulated position who was also responsible for multiple departments that included such varying operations areas as flight operations, cargo loading, scheduling, and training. *Id.* Mathis was also responsible for establishing and modifying a wide range of Amerijet's policies and procedures,

and had authority to ground or divert any flight. SOF ¶ 9.

Gonzalez was the Chief Pilot. SOF ¶ 16. He was one of five "Required Managers" employed in an FAA-regulated position. SOF ¶ 17. He flew airplanes as part of his job, and was a flight instructor and Check Airman. *Id.* He had a supervisory role over all of Amerijet's other pilots and was also Plaintiff's supervisor during the second half of 2019. *Id.*

Plaintiff's job was to schedule pilots to fly Amerijet airplanes and process their payroll. SOF ¶ 15. She managed just one department. SOF ¶ 15. Her job is in no way similar to Beach's, Mathis's, or Gonzalez's job and required a completely different set of qualifications and expertise. Moreover, Beach, Mathis, and Gonzalez reported to different supervisors than Plaintiff, and Gonzalez was Plaintiff's supervisor at the time of her termination. SOF ¶¶ 13, 16, 19.

Plaintiff claims that because all three alleged comparators shared some responsibility for monitoring and mitigating overages with her, they are similarly situated. ECF No. 89, at ¶¶ 46-49. This argument completely misses the mark. Importantly, bringing down overages was one of Plaintiff's primary duties, and she had *primary* responsibility for mitigating overages. SOF ¶¶ 33-34, 37, 40. Plaintiff testified that she was responsible for scheduling pilots efficiently to keep overages as low as possible. SOF ¶ 34. She also testified that she was responsible for generating daily overage reports. SOF ¶ 40.

Beach, Mathis, and Gonzalez may have shared *some* responsibility for the overage issue to the extent that overages were a small part of their overall job portfolios. However, if this were enough to demonstrate the sufficiency of a comparator, then every employee who shares *some* duty or responsibility with the Plaintiff, no matter how tenuous, would qualify as a comparator.

This Court has held beyond cavil that alleged comparators who are employed in different positions and have different duties and skillsets than the plaintiff are not similarly situated. *See*

*Weatherly v. ABC Legal, Inc.,* No. 1:19-CV-23678, 2023 WL 2701574, at *9 (S.D. Fla. Mar. 10, 2023) (Gayles, J.) (holding that plaintiff failed to show alleged comparator was similarly situated where alleged comparator reported to a different supervisor, had different job titles, and different duties); *Lemus v. Jones Lang Lasalle Americas, Inc.,* No. 19-25243-CIV, 2022 WL 16645568, at *7 (S.D. Fla. Sept. 29, 2022)*,* (Gayles, J.) (holding that plaintiff failed to show alleged comparator was similarly situated where alleged comparator had different job title, job functions, and skillset than plaintiff)*; see also Gilliam v. U.S. Dep't of Veterans Affs*., No. 2:16-CV-255-FTM-29CM, 2017 WL 6344207, at *7 (M.D. Fla. Dec. 12, 2017) ("Where the proposed comparator works in a different department, has different job duties, answers to a different supervisor . . . then she is categorically not similarly situated 'in all relevant aspects' and thus 'not a proper comparator.'").

Even individuals in similar positions are not similarly situated when they have different job duties. In *Calicchio v. Oasis Outsourcing Grp. Holdings, L.P*., this Court held that the plaintiff, who was employed as a Chief Human Resources Officer, was not similarly situated to the Chief Operating Officer, the Chief Financial Officer, the Chief Sales Officer and the Chief Information Officer because they had different jobs requiring different sets of expertise. 584 F. Supp. 3d 1215 at 1233-1234, 1245 (Ruiz II, J.), aff'd, No. 21-12854, 2022 WL 2761720 (11th Cir. July 15, 2022).

Plaintiff has failed to proffer the existence of similarly situated comparators who were treated more favorably. Accordingly, she cannot establish a *prima facie* case of race or gender discrimination and her claims, therefore, fail as a matter of law.

### iii.     *Mathis and Gonzalez were each counseled by Beach, and ultimately demoted after Plaintiff's termination.*

During his time as COO, Beach had verbally counseled Gonzalez and Mathis regarding several issues. SOF ¶ 120. Following Plaintiff's termination, Beach demoted Mathis as Director of Operations. *Id.* Beach also removed Gonzalez as Chief Pilot. *Id.* These adverse employment actions

against Gonzalez and Mathis demonstrate that Amerijet was not protecting either individual from unfavorable treatment due to their race or gender. Rather, each individuals' performance was assessed according to their particular position. Plaintiff argues that Gonzalez, Beach, and Mathis should all have been terminated due to the overage issue. As explained above, their positions involved much more than overages, whereas overages were central to Plaintiff's position. The evidence demonstrates that when Amerijet determined that Mathis and Gonzalez were not performing *their* responsibilities satisfactorily, they were removed from their positions.

**B.    Amerijet has met its burden of producing a legitimate, non-discriminatory reason for terminating Plaintiff's employment.**

Even if Plaintiff could establish a *prima facie* case of race or gender discrimination, which she cannot, Amerijet has clearly met its burden to produce a legitimate non-discriminatory reason for terminating Plaintiff's employment. Importantly, Amerijet's burden is "exceedingly light" because it "need only produce, not prove, a non-discriminatory reason." *Walker v. NationsBank of Florida, N.A.*, 53 F.3d 1548, 1556 (11th Cir. 1995) (internal quotations omitted).

In evaluating an employer's proffered explanation, it is not the court's role to act as a super-personnel department and second-guess or quarrel with the wisdom of the employer's decision; rather, the court's inquiry is limited to whether the employer gave an honest, non-retaliatory explanation that might motivate a reasonable employer. *See Chapman v. AI Transport*, 229 F. 3d 1012, 1030 (11th Cir. 2000); *Elrod v. Sears, Roebuck & Co.*, 939 F. 2d 1466, 1470 (11th Cir. 1991) An employer may lawfully fire an employee "for a good reason, a bad reason, a reason based on erroneous facts, or no reason at all, as long as its action is not for discriminatory reasons." *Id.*

As Crew Planning and Scheduling Manager, Plaintiff managed the Crew Scheduling Department. SOF ¶ 15. She was responsible for creating the pilots' flight schedules. *Id.* She also had primary responsibility for addressing the high amount of overage Amerijet was experiencing. SOF ¶¶ 33-34,

12

37, 40. However, Plaintiff was unable to get overages under control. SOF ¶¶ 43-50, 53-59.

In April and May 2019, overages were at 1899 hours and 1799 hours, respectively. SOF ¶¶ 43-44. Ameriejt's CEO Vic Karjian asked Plaintiff to reduce overages to 800 hours per month. SOF ¶ 41. In In July and August 2019, overages were over 1,700 hours and over 1,600 hours, respectively. SOF ¶ 48. In September 2019, overages exceeded 1,800 hours. SOF ¶ 55. In October 2019, overages were at 1,490 hours. SOF ¶ 56. In November 2019, there was approximately 1,800 hours of overage, which exceeded total flight hours. SOF ¶ 57. In the 28-day period ending December 15, 2019, Amerijet had 1,927 hours of overage. SOF ¶ 58. Vice President of Safety and Special Projects Richard Carpenter noted in an email to Beach that Amerijet was going to experience 200 hours of overage despite the fact that it was forecasted to have a 16% reduction in scheduled service. SOF ¶ 59.

Overages created a significant cost for Amerijet of approximately $400,000 per month. SOF ¶ 35. Plaintiff conceded that Ameriejt was concerned about overages. SOF ¶ 37. She testified that overages are the costliest expense for Amerijet along with fuel, and the topic was discussed "all the time." *Id.*

As of December 2019, it was clear that Plaintiff was not able to get the overage issue under control. Far from reducing overages to 800 hours as Karjian had asked, overages were actually increasing by the end of 2019. Moreover, Plaintiff failed to come up with any potential solution to the overage problem. SOF ¶¶ 28, 77.

As the primary person responsible for controlling overages, Plaintiff's demonstrated inability to reduce overages after nine months would have been sufficient, on its own, to justify Amerijet's (or any reasonable employer's) decision to seek a change in the Crew Scheduling Manager position. However, there were other issues that factored into Amerijet's decision to terminate Plaintiff.

In connection with Amerijet's attempts to bring down overages, Plaintiff was directed to generate

daily overage reports for management. SOF ¶ 40.  Plaintiff routinely failed to generate and submit the overage reports to management on a timely basis. SOF ¶¶ 60-67.

Plaintiff also made it difficult for Amerijet to address the overage issue due to her lack of transparency with respect to the Crew Scheduling Department. SOF ¶¶ 28, 68-71.

Finally, several crew schedulers within the Crew Scheduling Department, which were Plaintiff's subordinates, complained about her as well as the work environment within the department. SOF ¶ 72. Brad Coley ("Coley"), a Black crew scheduler, resigned due to Plaintiff's management of the department. SOF ¶ 73.  In his resignation letter, Coley claimed that Plaintiff micromanaged the department, displayed confrontational behavior, and created a hostile work environment. *Id.* Losing Coley was a "huge blow" to Amerijet because he was a good employee. SOF ¶ 74. Two other crew schedulers complained in December 2019 that Plaintiff had denied their vacation requests, did not allow them to call in sick unless they provided Plaintiff with prior notice, did not allow them to take lunch despite working over 12 hours per day, and was unresponsive to their emails. SOF ¶ 75.  Notably, Plaintiff testified that these two crew schedulers "hated each other," so it surprised her that they would complain to HR together. SOF ¶ 76.

By December 2019, it had become clear to Amerijet that Plaintiff was unable to perform her duties and responsibilities, or effectively manage the Crew Scheduling Department. SOF ¶¶ 28, 77. She was unable to get overages under control, she was unable to suggest solutions to the overage problem, she was unable to submit the overage reports, and there were significant issues with her management of the Crew Scheduling Department. SOF ¶¶ 28, 77. Amerijet's CEO, Vic Karjian, therefore, had a legitimate justification for seeking a change in Plaintiff's position. Amerijet has clearly met its "exceedingly light" burden of producing a legitimate, non-discriminatory reason for terminating Plaintiff's employment. *Walker v. NationsBank of Florida, N.A.*, 53 F.3d 1548, 1556 (11th Cir.

1995) (internal quotations omitted).

**C.** **Plaintiff cannot establish that Amerijet's legitimate non-discriminatory reason for terminating her employment is pretext.**

If Amerijet satisfies its burden of producing a legitimate, non-discriminatory reason for terminating Plaintiff, Plaintiff then bears the burden of persuasion that the proffered reason is pretextual, that is, she must prove "*both* that the reason articulated was false, *and* that discrimination was the real reason" for the employment action. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515-17 (1993).

To establish pretext, Plaintiff must show more than a mistake on the part of Amerijet. *See Silvera v. Orange Cty. Sch. Bd.*, 244 F. 3d 1253, 1261 (11th Cir. 2001). She must show that Amerijet lied – a standard she cannot meet. *Id.*; *Alvarez v. Royal Atl. Developers, Inc.*, 610 F. 3d 1253, 1265 (11th Cir. 2010).

Plaintiff has proffered two examples of circumstantial evidence supporting her allegation that Amerijet's reason for terminating her was pretextual: (1) that Plaintiff received a favorable performance evaluation on July 6, 2018, more than 17 months prior to her termination; and (2) that Amerijet indicated in its Position Statement to the EEOC that CEO Vic Karjian was the final decision-maker regarding her termination, but in an email sent by COO Brian Beach two weeks after Plaintiff's termination to someone outside Amerijet, Beach stated that "I got rid of her[.]" ECF No. 89, at ¶¶ 50-53, 59-61. For the reasons set forth below, both of these allegations fail to establish pretext.

> *i.* *Plaintiff's personally filled out her July 2018 Evaluation, and the supervisor who signed the evaluation, Steven Mathis, had only recently been assigned as Plaintiff's supervisor.*

Plaintiff's claim that her July 2018 performance evaluation, which was issued more than 17 months prior to her termination, is somehow evidence of pretext misses the mark for several reasons. First, Plaintiff's supervisor at the time her evaluation was issued, Steve Mathis, had only been her supervisor for approximately five months. SOF ¶¶ 20-21. The performance evaluation

covered July 2017 - July 2018, a period that preceded Mathis's appointment as Plaintiff's supervisor by approximately seven months. SOF ¶ 22.

Plaintiff had informed Mathis that his predecessor as Director of Operations, Robert Mencel, who was Plaintiff's supervisor before Mathis, had allowed Plaintiff to fill out her own performance evaluations. SOF ¶ 23.

Since Mathis was still familiarizing himself with his position and personnel, and had not had sufficient time to evaluate his direct reports sufficiently, Plaintiff completed the entire evaluation form dated July 12, 2018. *Id.* The only thing Mathis added to that form was his signature. *Id.* The claim that Plaintiff's own self-serving evaluation somehow negates the well-documented performance issues Plaintiff had over the year and a half *following* her 2017-2018 evaluation stretches the bounds of credulity.

The fact is that around the middle of 2018, as Amerijet began to evolve, Amerijet's management began to notice issues with Plaintiff's performance. SOF ¶ 26. The management team had a new set of expectations, and Plaintiff was unable or unwilling to meet those expectations. SOF ¶ 27. Plaintiff's argument "assumes that an employer may never increase its standards without necessarily opening itself up for allegations of discrimination. That is not correct." *Robertson v. Riverstone Communities, LLC*, 849 F. App'x 795, 806 (11th Cir. 2021).

### ii. *Plaintiff was terminated more than 17 months after her July 2018 performance evaluation.*

Moreover, Plaintiff was terminated more than 17 months *after* her July 2018 performance evaluation. SOF ¶ 77. It is difficult if not impossible to ascertain how this suggests, in any way, intentional discrimination based on Plaintiff's race or gender. Far from pretext, what the evidence clearly demonstrates is that Amerijet gave Plaintiff more than enough time to demonstrate whether she had the ability to adapt to the significant growth Amerijet was going to be experiencing and perform

her job satisfactorily. SOF ¶¶ 28, 77. Plaintiff failed to meet those expectations. Critically, Plaintiff cannot point to any favorable performance evaluations in 2019. Rather, the record evidence clearly demonstrates that Amerijet grew increasingly frustrated with Plaintiff's performance in the last year of her employment, particularly with respect to her inability to get overages under control. SOF ¶¶ 26-28, 77.

### iii. There is no discrepancy regarding who made the decision to terminate Plaintiff's employment.

On December 30, 2019, soon after Plaintiff's termination, Beach received an email from Jerry Elder ("Elder") informing Beach that Elder had a resume for the Director of Operations position. SOF ¶ 80. Elder was a consultant assisting Amerijet with issues in the Flight Department. SOF ¶ 81. Beach responded by asking Elder to send Beach the resume, and informed Elder of Plaintiff's termination by stating "I got rid of Marcia." SOF ¶ 82. Beach also explained that the "flight department is next," which was a reference to the fact that Amerijet was going to make changes in the personnel of the flight department.  SOF ¶ 83. Beach stated that he needed to be careful who he fired because members of the Flight Department were part of the certification process that Amerijet was undergoing to obtain ETOPS, which would authorize Amerijet to fly over water for more than 180 minutes. SOF ¶ 85.

Amerijet's Position Statement to the EEOC stated that CEO Vic Karjian was the final decision-maker regarding her termination. SOF ¶ 89. Amerijet also stated in its Position Statement that Beach was involved in Plaintiff's termination. SOF ¶ 90. Amerijet noted in its Position Statement that Beach was frustrated with Plaintiff's inability to get overages under control or submit overage information he had requested from her, that Beach made it clear to Mr. Karjian that he was frustrated with Plaintiff's performance, and that Mr. Karjian made the decision to terminate Plaintiff "based in part on Mr. Beach's frustration." *Id.*

Plaintiff claims that the email Beach sent to Elder stating that "I got rid of Marcia" is evidence of pretext because it creates a discrepancy regarding who made the decision to terminate Plaintiff. ECF No. 89, at ¶¶ 50-53, 59-61. However, Plaintiff's interpretation of the facts is a stretch.

In his deposition, CEO Vic Karjian made it clear that he made the decision to terminate Plaintiff. SOF ¶¶ 77, 79. Beach, in his deposition, confirmed the same. SOF ¶ 79.  Beach testified that he inarticulately used the words "I got rid of Marcia" in the email to Elder. SOF ¶ 82. Beach did not intend to convey that he was literally the person who made the decision to terminate Plaintiff. *Id.* He merely intended to inform an outside consultant that Plaintiff was no longer working for Amerijet, but did not feel it was necessary to go into detail regarding who was the actual decision maker regarding Plaintiff's termination. *Id.*

Beach's email, far from indicating pretext, is nothing more than the COO of Amerijet using "I" to refer to action the Company took rather than unnecessarily identifying the person who took such action. For example, Beach might say "I" purchased a new airplane or "I" hired a new pilot rather than specifically referencing the actual person who made such purchase or hire. The individual with whom Beach was communicating was an outside consultant. SOF ¶¶ 81-82. There would therefore be no reason for Mr. Beach to mention that "I was very frustrated with Ms. McManus's performance and expressed such frustration to Mr. Karjian, but as CEO, Mr. Karjian made the ultimate decision on her termination." Instead he wrote that "I" (read: Amerijet) got rid of her.

Plaintiff is grasping at straws with this argument, which is highlighted by the fact that she cherry picked Beach's email in her Complaint to make it seem like his statement that "I need to be careful who I fire at the moment" was directly connected to his statement that "I got rid of Marcia." ECF No. 89 ¶ 60. The entire, unedited version of Beach's email makes it clear that he needed to

be careful whom he fired because he needed ETOPS: "I got rid of Marcia, flight department is next **but I need ETOPS first so I need to be careful who I fire at the moment.**" (Emphasis added). SOF ¶ 82-83. Clearly, Beach was considering other personnel changes in the Flight Department and his desire to be careful related to Amerijet's need to obtain ETOPS rather than anything related to race or gender. This is further evidence by the fact that subsequent to Plaintiff's termination, Beach demoted both Director of Operations Mathis and Chief Pilot Gonzalez. SOF ¶ 120.

### iv.     Plaintiff has failed to establish pretext.

There is no evidence of "lies" or a "phony reason for some action." *See Silvera*, 244 F. 3d at 1261. The record contains no evidence of "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in Amerijet's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence." *See Alvarez*, 610 F. 3d at 1265. It is irrelevant whether Plaintiff believed she was a good employee or that a performance evaluation predating her termination by more than 17 months precluded her from termination—what matters is what was in the mind of the decision-makers. Accordingly, the Court should not now reexamine Amerijet's business decision. As Plaintiff cannot prove a *prima facie* case of discrimination, Plaintiff's Title VII and FCRA race and gender discrimination claims fail as a matter of law and summary judgment should be entered in favor of Amerijet.

### III. <u>Plaintiff's Claims For Retaliation Under Title VII, The FCRA, And Florida's Whistleblower Act Fail ("FWA") As A Matter Of Law</u>

Counts III, VI, IV and VII of Plaintiff's Second Amended Complaint ("SAC") purport to assert claims for retaliation under Title VII, the FCRA, and the Florida Whistleblower Act, Fla. Stat. § 448.102 ("FWA"), respectively. *See* ECF No.89 at ¶¶ 78-83, 100-117. Plaintiff alleges that she was retaliated against for complaining of a "hostile work environment" in a September 8, 2019

email. ECF No.89 at ¶¶ 35, 54, 80, 102, 109. To be sure, Plaintiff's September 8, 2019 email is the only instance of protected activity that she has pled as the basis for her retaliation claims. *Id.* Plaintiff's retaliation claims fail as a matter for law for several reasons. First, she did not engage in protected activity. Second, there is no causal connection or sufficient temporal proximity between her alleged protected activity and her termination. Finally, Amerijet had a legitimate, non-retaliatory reason for terminating Plaintiff's employment. Each of these is independently fatal to Plaintiff's retaliation claims.

**A. Plaintiff Fails To Establish A *Prima Facie* Case Of Retaliation Under Title VII, FCRA, And The FWA**

With no direct evidence of any retaliatory action, Plaintiff's claims under the FWA, Title VII, and the FCRA are analyzed under the same burden-shifting framework for circumstantial evidence established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Sierminski v. Transouth Fin. Corp.*, 216 F.3d 945, 950 (11th Cir. 2000) (explaining that the district court correctly applied the framework for analyzing Title VII retaliation cases to an FWA claim); *Wallace v. Pub. Health Tr. of Dade Cty.*, 370 F. Supp. 2d 1247, 1250 (S.D. Fla. 2005) ("Case law interpreting Title VII is applicable to claims under FCRA").

Under this framework, Plaintiff must prove a *prima facie* case of retaliation by proving the following: (1) that she engaged in statutorily protected activity; (2) that she suffered an adverse employment action; and (3) there was a causal link or connection between the protected activity and the adverse action. *Butler v. Alabama Dep't of Transp.*, 536 F.3d 1209, 1212-1213 (11th Cir. 2008); *Kearns v. Farmer Acquisition Co.*, 157 So.3d 458, 462 (Fla. 2d DCA 2015). Failure to meet any element of her *prima facie* case bars her claim. *See Sierminski*, 216 F. 3d at 950.

Upon establishing a *prima facie* case, the burden of production shifts to Amerijet to articulate a legitimate, non-retaliatory reason for its decisions.  Upon doing so, Plaintiff must then proffer evidence

that Amerijet's reasons are pretextual. *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981); *Raney v. Vinson Guard Serv., Inc.*, 120 F.3d 1192, 1196 (11th Cir. 1997); *see also Whitby v. Secretary for the Dep't of Homeland Security*, 480 Fed. App'x. 960, 963 (11th Cir. June 28, 2012). Significantly, Plaintiff always retains the ultimate burden of proving that "the desire to retaliate was the but–for cause of the challenged employment action." *Univ. of Texas SW Med. Cent. v. Nassar*, 570 U.S. 338, 339 (2013). "This requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Id.* at 2533; *see also Sims v. MVM, Inc.*, 704 F.3d 1327, 1334 (11th Cir. 2013).

   i.   ***Plaintiff cannot establish that she engaged in statutorily protected activity under Title VII, the FCRA, or the FWA.***

   In order to meet the first prong of her *prima facie* case, Plaintiff must establish that she engaged in protected activity by showing that she opposed an unlawful employment practice. *Silver v. City of Pembroke Pines*, No. 21-CV-61148, 2021 WL 4341736, at *5 (S.D. Fla. Sept. 5, 2021) (citations omitted). Importantly, Plaintiff "must establish a reasonable and good faith belief that the discrimination existed." *Candina v. Univ. of Miami*, 185 F. Supp. 3d 1343, 1351 (S.D. Fla. 2015). She must demonstrate both that she subjectively believed that the employer was engaged in unlawful employment practices and that her belief was objectively reasonable in light of the facts and record presented. *Id.* (citing *Little v. United Tech., Carrier Transicold Div.*, 103 F.3d 956, 960 (11th Cir.1997) (citations omitted)).

   The case law is clear that "[c]omplaints to an employer only constitute protected activity under Title VII if they pertain to matters protected by the statute." *Quach v. Paragon Sys. Inc.*, No. 115CV00750RWSRGV, 2015 WL 13719674, at *7 (N.D. Ga. Oct. 28, 2015) (citing *Sridej v. Brown*, 361 Fed.Appx. 31, 35 (11th Cir. 2010) (citations omitted). "It is not enough for the employee merely to complain about a certain policy or certain behavior of co-workers and rely on

the employer to infer that discrimination has occurred." *Finch v. Morgan Stanley & Co. LLC*, No. 15-81323-CIV, 2016 WL 4248248, at *6 n. 5 (S.D. Fla. Aug. 11, 2016) (citation omitted).

This is precisely what Plaintiff's September 8, 2019 email (the only alleged instance of protected activity) amounts to -- a complaint about "certain behavior of co-workers" with absolutely no indication or implication that the behavior complained about was due to discrimination on the basis of Plaintiff's race or gender. SOF ¶ 98. In fact, Plaintiff's email suggests exactly the opposite, that Beach was subjecting many managers, including white males, to hostile treatment irrespective of their race or gender. SOF ¶¶ 98-100, 104-105.

For example, Plaintiff states in the September 8, 2019 email that she began to be written up after she asked for a meeting with CEO Karjian to discuss Karjian's disappointment with the performance of the Crew Scheduling department. SOF ¶ 98. This suggests that she was retaliated against for asking Karjian to meet with her to discuss his disappointment with her department.

She further claimed in her September 8, 2019 email that she *and other managers* were working under a hostile work environment due to Beach. SOF ¶ 99. Plaintiff never claims that she felt Beach's behavior was discriminatory. SOF ¶ 98. She never claims that she felt she was being singled out. Plaintiff did even not state in her email that the "other managers" who were allegedly being subjected to a hostile environment by Beach are Black or female. Instead, she provided just one example of another manager whom Beach had allegedly harassed and bullied, Ed Cook – a white male. SOF ¶¶ 99-100.

When presented with her September 8, 2019 email at her deposition and asked to identify other managers who felt targeted by Beach, Plaintiff identified Alex Mendoza, a Hispanic male. SOF ¶¶ 101-102.

Plaintiff further testified that Beach was not hostile to people who were in his "clique." SOF ¶ 103.

She identified a female co-worker, Yunel Alizo, as someone Beach treated with favoritism, which suggests that Beach was not discriminating against females or Plaintiff due to her sex. *Id.*

Finally, Plaintiff stated in her September 8, 2019 email that "something is wrong if all your Managers feel they have a target on their heads and this is not an isolated incident based on their comments." SOF ¶ 105.

Plaintiff's email, therefore, claimed that Beach treated all managers in a hostile manner, and identified just one manager in particular who was harassed by Beach – a white male. In no way does that email establish any sort of objective belief that Beach was engaging in *unlawful* discrimination. It established, at best, a belief that Beach treated many managers in a like manner irrespective of race or gender. Plaintiff's deposition testimony only bolsters this view in as much as she testified that yet another non-Black male co-worker was targeted and that a female co-worker was treated with favoritism. She also testified that she never heard any Amerijet manager make any sexist remarks, and never heard Beach make any racist remarks. SOF ¶¶ 118-119.

"It is not enough for the employee merely to complain about a certain policy or certain behavior of co-workers and rely on the employer to infer that discrimination has occurred." *Finch v. Morgan Stanley & Co. LLC*, No. 15-81323-CIV, 2016 WL 4248248, at *6 n. 5 (S.D. Fla. Aug. 11, 2016) (citation omitted). Thus, relying on Amerijet to infer that discrimination has occurred is not sufficient to qualify Plaintiff's September 8 email as protected activity, and her email would not even allow Amerijet to make such an inference. Moreover, Plaintiff never mentioned in any emails to Amerijet, or in either meeting with Amerijet's CEO Karjian, that she felt she was being discriminated against. SOF ¶¶ 98, 112-115.

This Court has held that emails containing "vague claims of discrimination or unfair treatment, without an allegation of discrimination based on race, gender, or national origin,

do not constitute protected activity." *Hamilton v. Sikorsky Aircraft Corp.*, No. 9:17-CV-80289, 2018 WL 10704410, at *11 (S.D. Fla. Mar. 6, 2018) (Rosenberg, J.), aff'd, 760 F. App'x 872 (11th Cir. 2019). "To constitute protected activity, a plaintiff must, at the very least, communicate her belief that illegal discrimination is occurring." *Verna v. Pub. Health Tr. of Miami-Dade Cty.*, 539 F. Supp. 2d 1340, 1357 (S.D. Fla. 2008). Plaintiff never communicated such a belief to Ameijet, either in her September 8 email (her only alleged instance of protected activity) or otherwise. SOF ¶¶ 98, 112-115, 117.

Plaintiff's own testimony further undercuts her retaliation claims. She testified that Beach was not hostile to people who were in his clique, indicating that favoritism, rather than discrimination, was the reason for Beach's behavior. SOF ¶ 103. Importantly, favoritism is not unlawful. *See Etienne v. Muvico Theaters, Inc.,* No. 01-6265-CIV., 2003 WL 21184268, at *14 (S.D. Fla. Mar. 11, 2003) (Holding that "discourteous behavior, managerial favoritism, office politics, scurrilous and shoddy business practices, resentment and hurt feelings" are insufficient to suggest that unlawful discrimination took place); *Gregorio v. Archdiocese of Miami, Inc.*, No. 09-CIV-23744, 2010 WL 11505436, at *2 (S.D. Fla. Jan. 14, 2010) (holding that plaintiff did not state a claim for discrimination when "what facts Plaintiff does allege, *i.e.*, that [plaintiff's supervisor] was motivated by favoritism, negate against any reasonable inference of discriminatory animus.").

Finally, the fact that Plaintiff alleged in her email that a hostile work environment existed is insufficient to establish that she engaged in protected activity because she did not provide any information to Amerijet at the time suggesting that the hostile work environment was connected to her race or gender. *See Canty v. Fry's Elecs., Inc.*, No. 1:09-CV-3508-WSD-LTW, 2012 WL 1038619, at *9 (N.D. Ga. Feb. 12, 2012) ("While [p]laintiff uses buzz words, such as hostile work environment ... to describe his former complaints to management.... [p]laintiff's complaints to

management do not suggest any discrimination on the basis of race, color, or any other classification protected by Title VII[.]"); *see also Wells v. Miami Dade Cnty.*, Case No. 15-22431-Civ, 2016 WL 7492560, at *6 n. 8, 2016 U.S. Dist. LEXIS 180303, at *13 n. 8 (S.D. Fla. Dec. 30, 2016) (finding that the plaintiff's "retaliation claim is flawed because she ... complained internally that she had been treated unfairly by [a manager] without explaining why she thought he was mistreating her"); *Williams v. Gallup, Inc.*, No.1:15-CV-02650-WSD-WEJ, 2016 WL 10655518, at *15, 2016 U.S. Dist. LEXIS 194981, at *34-35 (N.D. Ga. Sept. 15, 2016) (finding that plaintiff's complaint of being "treated differently" did not constitute protected activity where he did not "assert that any difference in treatment was based on his gender or race").

### ii. Plaintiff Cannot Establish That, Under The FWA, She Objected To Or Refused To Participate In An Actual Violation Of A Law, Rule, Or Regulation

Section 448.102(3) of the FWA prohibits an employer from taking a "retaliatory personnel action against an employee because the employee has: "[o]bjected to, or refused to participate in, any activity, policy, or practice of the employer which is in violation of a law, rule or regulation."  Under the FWA, a "law, rule or regulation" is "any statute or ordinance or any rule or regulation adopted pursuant to any federal, state, or local statute or ordinance applicable to the employer and pertaining to the business." Fla. Stat. § 448.101(4).

To establish the first prong of her *prima facie* case under the FWA (i.e., that she engaged in protected activity), Plaintiff must establish she complained about an ***actual*** violation of a law, rule or regulation.  *See* Fla. Stat. § 448.102(3); *Kearns v. Farmer Acquisition Co.*, 157 So. 3d 548, 465 (Fla. 2d DCA) (stating that under section 448.102(3) a party must prove that they "objected to an actual violation of law" or that they "refused to participate in activity that would have been an actual violation of law"); *Pierre v. AIDS Healthcare Found., Inc.*, No. 19-62556-CIV, 2020 WL 6381557, at *4 (S.D. Fla. Oct. 30, 2020).

As explained in Section III(A)(1) above, Plaintiff's September 8, 2019 email was not an objection to unlawful discrimination. As such, Plaintiff cannot establish she complained about an actual violation of law, or even that she had an objectively reasonable belief that unlawful discrimination was taking place.

### iii.    There Is No Causal Link Between The Protected Activity And The Adverse Action

In addition to failing to establish that she engaged in protected activity, Plaintiff fails to establish any causal connection between her alleged protected activity and her termination. Plaintiff alleged that the temporal proximity between her September 8, 2019 email and her December 18, 2019 termination, a period of just over three months, is evidence of retaliation. ECF No. 89 at ¶¶ 54-56. However, the case law is clear that even a three-month gap between statutorily protected activity and adverse employment action is insufficient to establish retaliation based on close temporal proximity. *Henderson v. City of Birmingham, Alabama*, 826 F. App'x 736, 742 (11th Cir. 2020) (citing (citing *Thomas v. Cooper Lighting, Inc*., 506 F.3d 1361, 1364 (11th Cir. 2007); *see also Reed v. Forney Indus., Inc*., 800 F. App'x 782, 789 (11th Cir. 2020) (citing *Drago v. Jenne*, 453 F.3d 1301, 1308 (11th Cir. 2006) (holding that a three-month gap between the protected action and alleged retaliation was not sufficiently proximate to show causation); *Lassiter-Ware, Inc*., 2013 WL 4456546 at *14 (M.D. Fla. Aug. 16, 2013) (citing *Criswell v. Intellirisk Mgmt. Corp., Inc*., 286 F. App'x 660, 664 (11th Cir.2008).

Plaintiff has provided no other evidence, whether direct or circumstantial, to suggest that her termination was connected to her September 8, 2019 email other than temporal proximity. Accordingly, Plaintiff's retaliation claims fail as a matter of law.

> **i.** *The writes ups Plaintiff received occurred before her alleged protected activity, and therefore cannot qualify as evidence of retaliation.*

Although it is unclear, it appears Plaintiff may be alleging that the writes ups Plaintiff received the day before her August 28, 2019 meeting with Karjian is evidence of retaliation. ECF No. 89 at ¶¶ 54-58. Importantly, Plaintiff does not allege that she engaged in any protected activity prior to the write ups.

Plaintiff's August 7, 2019 email to Karjian requested a meeting to discuss Karjian's disappointment with the performance of the Crew Scheduling department. SOF ¶ 91. Plaintiff does not allege, nor can she assert, that this email amounted to protected activity.

Plaintiff was written up on August 27, 2019. SOF ¶¶ 65, 94. Since Plaintiff had not yet engaged in any alleged protected activity, those write ups cannot amount to evidence of retaliation.

Plaintiff's August 28, 2019 meeting with Karjian was not protected activity, nor does Plaintiff claim that it was. Plaintiff testified that she requested the meeting to discuss Karjian's disappointment with the performance of the Crew Scheduling department. SOF ¶ 91. She also testified that she did not bring up discrimination at the meeting. SOF ¶ 96. The topics discussed at the meeting were the overage issue, and the performance and low morale of the Crew Scheduling department. SOF ¶ 96.

Plaintiff was written up on September 3, 2019. SOF ¶ 97. Since Plaintiff had not yet engaged in any alleged protected activity, that write up cannot amount to evidence of retaliation.

Plaintiff alleges that she engaged in protected activity on September 8, 2019, when she sent an email to Amerijet's General Counsel, Joan Canny ("Canny"), and Amerijet's Vice President of Human Resources, Isis Suria ("Suria"). SOF ¶ 98; ECF No.89 at ¶ 35. Importantly, in her email, Plaintiff complains about having been written up multiple times in the previous two weeks. SOF ¶ 98.

It is therefore impossible for Plaintiff to claim that the write ups are evidence of retaliation when they occurred prior to her alleged protected activity.

**B. <u>Amerijet Has Met Its Burden Of Producing A Legitimate, Non-Discriminatory Reason for Terminating Plaintiff's Employment And Plaintiff Cannot Establish That Amerijet's Reason Is Pretext</u>**

As explained in Section II(B) and II(C), Amerijet has met its burden of producing a legitimate, non-discriminatory reason for terminating her employment, and Plaintiff cannot stablish that Amerijet's reason is pretext.

As Plaintiff cannot prove a *prima facie* case or establish retaliation as the "but for" reason for her termination, Plaintiff's FWA, Title VII, and FCRA claims fail as a matter of law and summary judgment should be entered in favor of Amerijet.

## <u>CONCLUSION</u>

For all the reasons set forth above, Defendant, Amerijet International, Inc., respectfully requests that the Court grant its Motion for Summary Judgment, disposing of the case in its entirety, and such other relief as the Court deems just and proper.

Dated:  July 31, 2023
        Miami, Florida

Respectfully submitted,

STEARNS WEAVER MILLER WEISSLER
ALHADEFF & SITTERSON, P.A.
Museum Tower, Suite 2200
150 West Flagler Street
Miami, FL 33130
Telephone: (305) 789-3200
Facsimile:  (305) 789-3395

By:  */s/ Paul Crucet*             
    PAUL CRUCET, ESQ.
    Florida Bar No.: 122169
    E-Mail: pcrucet@stearnsweaver.com
    ROBERT S. TURK, ESQ.
    Florida Bar No.: 261343
    E-Mail: rturk@stearnsweaver.com

*Attorneys for Defendant,*
*Amerijet International, Inc.*

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on July 31, 2023, I electronically filed the foregoing document with the Clerk of Court using CM/ECF.  I also certify that the foregoing document is being served this day on all counsel of record or *pro se* parties identified on the below Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive Notices of Electronic Filing.

    */s/ Paul Crucet*             
    PAUL CRUCET, ESQ

## SERVICE LIST

### *MARCIA MCMANUS v. AMERIJET INTERNATIONAL, INC.*
### CASE NO.: 0:21-cv-61617-DPG/JMS

Michael L. Elkins, Esq.
Florida Bar No. 523781
melkins@mlelawfirm.com
**MLE LAW**
1212 Northeast 16th Terrace
Fort Lauderdale, FL 33304
Telephone: (954) 401-2608
*Co-counsel for Plaintiff*

Joshua M. Entin, Esq.
Florida Bar No. 0493724
josh@entinlaw.com
**ENTIN LAW GROUP, P.A.**
633 s. Andrews Avenue, Suite 500
Fort Lauderdale, FL 33301
Telephone: (954) 761-7201
*Co-counsel for Plaintiff*

*Served Via CM/ECF*